ILLINOIS VALLEY PAVING CO., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Illinois Valley Paving Co. v. Commissioner
Docket No. 12074-79.
United States Tax Court
T.C. Memo 1981-468; 1981 Tax Ct. Memo LEXIS 277; 42 T.C.M. (CCH) 909; T.C.M. (RIA) 81468; August 27, 1981. Theodore C. Rammelkamp, Jr., and Larry D. Kuster, for the petitioner. Roberta P. Cona, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACTS AND OPINION PARKER, Judge: Respondent determined a deficiency in petitioner's Federal income tax for the taxable year ended November 30, 1972, in the amount of $ 14,703.43. [1] After concessions, the only issue for decision is whether two pieces of construction equipment purchased by petitioner in 1975 constitute "new section 38 property" as defined in section 48(b), [2] so as to qualify for the investment credit under section 38. Specifically, the issue is whether "the original use of such property commenc[ed] with the taxpayer" as required by section 48(b)(2). *279 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Illinois Valley Paving Co. (hereinafter petitioner) is a corporation organized under the laws of the State of Illinois. Pettioner timely filed its corporate income tax returns for each of the taxable years ended November 30, 1972, and November 30, 1975, with the Internal Revenue Service Center at Kansas City, Missouri. When it filed its petition herein, petitioner's principal office was located in Bluffs, Illinois, and its principal area of operation was in western and central Illinois. Petitioner, formerly Illinois Valley Asphalt, Inc., operated three asphalt plants and conducted a successful asphalt paving business through 1971 or 1972. Sometime during 1971 or 1972, petitioner decided to diversify its business and start a concrete paving operation so it could participate in the construction of the interstate highway in west central Illinois. However, during the first two or three years that it engaged in concrete paving work, petitioner suffered substantial losses due in part to its use of out-of-date *280 and used concrete paving equipment. Sometime during late 1974 or early 1975, petitioner began to look for more up-to-date and modern concrete paving equipment in order to make its concrete paving business profitable. Petitioner was interested in acquiring a "placer spreader trimmer" and a "suburban paver," both manufactured by CMI Corporation in Oklahoma City, Oklahoma. A spreader spreads or places the wet concrete (and sometimes the reinforcing steel) in an area; a paver or finisher follows the spreader and shapes the concrete into the final product. The CMI spreader and paver involved in this case were rather complex pieces of heavy equipment containing a lot of hydraulic and electronic devices, and, as such, were quite different from the concrete paving equipment petitioner had been using. Petitioner discussed the acquisition of these machines with two different distributors of CMI equipment, A.H. Puffer Company, Inc., in Rockford, Illinois, and Roland Machinery Company in Springfield, Illinois. Petitioner hoped eventually to purchase a CMI spreader and paver. However, petitioner first wanted a trial period during which to use the equipment before purchasing it, because *281 the acquisition represented a substantial expenditure of funds for a company such as petitioner and a mistake on such a purchase could have put the company out of business. Petitioner wanted to be sure the equipment functioned properly and met the company's needs before it was locked in to a purchase of such expensive and complex machines, particularly since the paver had never been approved by the State of Illinois. This CMI spreader had already been approved. The Puffer Company was a manufacturers' representative for various manufacturers of heavy equipment and was in the business of leasing or selling heavy equipment to its customers. However, petitioner had never done business with the Puffer Company before and did not know whether the company would stand behind the equipment it sold. For that reason, petitioner wanted to lease the equipment at first rather than purchase it outright. Moreover, the Puffer Company was the only distributor that offered petitioner a trial period for using the CMI machines before purchasing them. Petitioner and the Puffer Company executed agreements designated as "leases" and "options to purchase" for the paver and the spreader. On March 26, 1975, the *282 parties executed a "lease" of the paver for a minimum rental period of four months at a monthly rental of $ 13,500. The monthly rental rate represented about eight percent of the total discounted purchase price for the paver. Also on March 26, 1975, the parties entered into an "option to purchase" the paver giving petitioner the right to purchase the paver after the lease period for a total purchase price of $ 188,127 with (1) all rentals paid to be applied to the purchase price; (2) interest of 1.2 percent to be charged on the unpaid balance of the purchase price; and (3) a six percent discount on the $ 188,127 purchase price of a $ 35,000 trade-in on another CMI paver petitioner already owned. The agreement also gave petitioner the right to rent the trade-in paver from the Puffer Company at a monthly rental of eight percent of the trade-in price. On April 7, 1975, the parties executed a "lease" of the spreader for a minimum rental period of three months at a monthly rental of $ 12,000. [3] The monthly rental rate represented about seven percent of the total discounted purchase price for the spreader. Also on April 7, 1975, the parties entered into an "option to purchase" the *283 spreader for a total price of $ 176,165 plus Illinois tax. Except for the absence of a trade-in provision on the spreader, the conditions in the "option" agreement on the spreader were identical to the conditions in the option on the paver, including the six percent discount on the purchase price if the machine was purchased. The terms and conditions in the agreements designated as "leases" of the paver and spreader were also identical. Those agreements provided, interalia, that (1) the "lessee" (petitioner) had the duties to pay rent, to return the machines in good condition, to indemnify the lessor against all loss and damage to the machines, to protect the machines against claims, to perform repairs, to pay operating expenses of the machines, to pay taxes or charges levied upon the equipment or its use during the period of the lease, to furnish a bond to insure the fulfillment of the lease, and to pay freight and transportation charges; and that (2) the "lessor" (the Puffer *284 Company) had the rights to retain title to the machines unless transferred to the lessee through sale, to give a security interest in the machines to finance the equipment (which security interest was superior to any interest of the lessee in the property), and to assign its rights under the agreement. Each lease provided, however, that the lessee was to be liable for the full rental for the entire minimum period of the lease even though the equipment was returned to the lessor before the end of the period. Pursuant to the lease agreements, petitioner made four monthly payments of rent on the paver of $ 13,500 each during 1975 evidenced by invoices from the Puffer Company, dated April 25, May 22, June 26, and July 28; petitioner made three monthly payments of rent on the spreader of $ 12,000 each during 1975 shown in invoices from the Puffer Company dated May 9, May 22, and June 26. Petitioner recorded these rental payments, totalling $ 36,000 for the spreader and $ 54,000 for the paver, on its books in an "equipment rental" account. See footnote 6 below. The Puffer Company also recorded the rentals received under the lease agreements on its corporate books in an account labeled *285 "equipment rental." The Puffer Company had purchased this particular CMI spreader and paver from CMI before it entered into the lease agreements with petitioner. The CMI spreader and paver herein were the only such machines that the Puffer Company either rented or sold during the three-year period 1974 through 1976. The Puffer Company owned, rented, and sold other types of spreaders and pavers during that period. The monthly rentals that the Puffer Company charged for the CMI paver and spreader were somewhat lower than the 1975 rental guidelines set for that equipment by CMI, eight and seven percent of the purchase prices, respectively, compared to the 10 and 11 percent used by CMI. [4]CMI as a manufacturer tried to sell its equipment (either to distributors or directly to users), but it also rented the equipment and charged identical rental rates whether or not there was an option to buy. The Puffer Company also preferred to sell equipment and hoped to sell this particular CMI spreader and paver to petitioner ultimately, but it was also willing to rent and considered the rental rates to petitioner to be the fair rental rates for those items. Puffer's normal rental rates ranged *286 from five to 10 percent of original purchase price per month. Like CMI, the Puffer Company customarily charged the same rental rates for heavy equipment with an option to purchase as for such equipment without an option. *287 In accordance with the lease agreements, the Puffer Company delivered the paver to petitioner on April 24 or 25, 1975, and the spreader on May 7 or 8, 1975. The spreader was delivered to a job petitioner was working on in Greene County, Illinois. The paver was delivered to the Route 29 job north of Springfield, Illinois, which was a different project in a different county. The machines arrived at the job sites in a disassembled condition. Petitioner, assisted by employees of the Puffer Company and CMI, completed assembly of the paver in six days by May 1, 1975, and of the spreader in one day by May 9, 1975. Shortly thereafter, petitioner used the machines separately at the two different construction sites where they had been delivered. The record does not indicate that petitioner ever used these two pieces of equipment together as a tandem unit at any time before exercise of the options to purchase. During petitioner's initial use of the paver and spreader, the Puffer Company and CMI sent their servicemen to provide technical assistance on any problems with the machines. The paver required more servicing because (1) it was a more complex and innovative machine than the spreader, *288 and (2) unlike the spreader, the paver had never been operated in or approved by the State of Illinois. In Illinois, construction equipment such as the paver must be approved by the state when it is first used on public jobs. Since petitioner did almost all of its work on public jobs, the paver would have had little or no value to petitioner if the state had refused to let the company use it on state projects. Illinois State officials observed the paver in operation and allowed petitioner to use the paver on the Route 29 construction job. The approval process or "certification" as petitioner styled it amounted to little more than the fact that State officials, after observing the paver in operation, did not disapprove it and permitted petitioner to continue to use it on the job. The record does not establish that any further approval or "certification" was required or ever occurred thereafter. [5]
*289 Petitioner's job superintendents maintained job diaries, and entries in those books do not indicate any problems with the spreader at any time after May 16, 1975, or with the paver at any time after June 6, 1975. Those pieces of equipment were fully operational and in use on the respective construction projects herein after those dates. Around the end of June or July 1, 1975, petitioner notified the Puffer Company of its intent to exercise the option and purchase the spreader at the end of the lease period. Petitioner informed the Puffer Company near the end of August that it would exercise the option and buy the paver at the end of the rental period. Petitioner thus exercised the option to purchase the spreader on August 5, 1975, and executed a retail installment contract with the Puffer Company for the balance due, including interest and taxes, of $ 140,423.46 on August 15, 1975, the last day of the rental period. This figure of $ 140,423.46 represented the original purchase price discounted by six percent, plus Illinois state and municipal taxes and accumulated interest, less the $ 36,000 rental amount. The contract provided that petitioner was to pay 11 monthly installments *290 of $ 11,701.96 each and a final installment of $ 11,701.90 with 11 percent interest each month on the unpaid balance. Petitioner exercised the option on the paver on September 2, 1975, and purchased the paver for $ 135,116.16. This figure of $ 135,116.16 represented the original purchase price discounted by six percent, plus Illinois state and municipal taxes and accumulated interest, minus the $ 54,000 rental amount. When the options to purchase were exercised, petitioner entered the balances due on the spreader of $ 129,595 ($ 140,423.46 less taxes and interest) and on the paver of $ 122,840 ($ 135,116.16 less taxes and interest) in a "concrete paving equipment" account on its books. [6] At the same time, the Puffer Company recorded the balances due of $ 129,595 and $ 122,840 on the machines in an "equipment sales" account on its books. *291 When customers returned leased equipment to the Puffer Company without exercising options to buy, the company was then free to sell that used equipment in a much wider market than its restricted sales territory for new equipment. When the Puffer Company sold such used equipment, it customarily sold it at the original price for new equipment less the rental receipts received for the equipment. The $ 129,595 and $ 122,840 in this case represented the fair market value of the spreader and paver, respectively, at the time the options to purchase were exercised. On its corporate income tax return for the year ended November 30, 1975, petitioner claimed a tentative investment credit in the total amount of $ 52,520.89. Petitioner's purchase of the CMI spreader and paver during 1975 accounted for $ 34,243.50 of this tentative investment credit and resulted in its claim of an investment credit carryback in the same amount for its taxable year ended November 30, 1972. See footnote 6. The Puffer Company did not claim an investment credit with respect to these machines during 1975 and did not elect under section 48(d) to treat petitioner as having acquired the equipment for purposes *292 of claiming the investment credit. Respondent determined that petitioner was not entitled to the investment credit on the paver and spreader during 1975, and thus disallowed petitioner's investment credit carryback to 1972. OPINION The only question for decision is whether petitioner is entitled to an investment credit under section 38 with respect to two pieces of construction equipment that it purchased in 1975. Specifically, the issue is whether the equipment was "new section 38 property," defined in section 48(b)(2) as property "the original use of [which] commenc[ed] with the taxpayer." Petitioner maintains that the equipment constituted "new section 38 property" and that it was the first user so as to be entitled to the investment credit on the equipment. [7] In support, petitioner argues alternatively that (1) the "lease-option" agreements herein were conditional sales contracts, or (2) that the equipment was not "placed in service" for investment credit purposes until the machines became "operational." Petitioner asserts that the equipment was not "operational" until it was tested as fit for its intended functions and until the paver was approved or "certified" by *293 the State of Illinois, by which time petitioner says it had purchased the machines. Respondent argues that the agreements herein were in substance and in form leases with options to purchase and that petitioner's use of the equipment as lessee did not constitute the "original use" required in order to qualify it for the investment credit on "new section 38 property." Respondent asserts that the use of the equipment herein by the lessor in its leasing business constituted the "original use" contemplated by the statute. We agree with respondent. Whether the agreements herein were leases with options to purchase or conditional sales contracts must be determined from the substance and not the form of the transactions between the parties. The substance of a transaction for tax purposes is a function of the intent of the parties at the time the agreements were made as shown by all of the facts and *294 circumstances and the economic realities existing at that time. Frank Lyon Company v. United States, 435 U.S. 561, 573-574 (1978); Swift Dodge v. Commissioner, 76 T.C. 547 (1981), on appeal (9th Cir. July 2, 1981); Northwest Acceptance Corp. v. Commissioner, 58 T.C. 836, 845 (1972), affd. per curiam 500 F. 2d 1222 (9th Cir. 1974); Lockhart Leasing co. v. Commisioner, 54 T.C. 301, 313 (1970), affd. 446 F. 2d 269 (10th Cir. 1971). At the time the parties entered into the transactions regarding the equipment herein, they clearly intended their agreements to be leases with options to purchase. For the first two or three years that petitioner did concrete paving work, it suffered substantial losses due in part to its use of outdated concrete paving equipment. Petitioner thus hoped to make its concrete paving business profitable by acquiring the more modern CMI paver and spreader. Before purchasing such expensive equipment, however, petitioner wanted a trial period during which to use the equipment so that it could see whether the equipment functioned properly and met its needs nd *295 whether the paver received approval from the State of Illinois. During 1975, James P. Bruner and Roland Bogle were officers of petitioner and the Puffer Company, respectively, and conducted the negotiations herein. At the trial, they testified that the purpose of the trial period was so that in the event that problems developed with the equipment, such problems would be Puffer's problems, petitioner would not be "locked in" to buy the equipment, and petitioner would be free to return the equipment to Puffer and retain no interest therein. Bruner candidly admitted that he went to the Puffer Company because purchase of this equipment was such a "big gamble" and Puffer would "allow us (petitioner) to use the equipment before we were locked in and had to take it." The fact that both parties also hoped eventually for a sale of the equipment is not inconsistent with their clear intent at the time they executed the agreements to lease the machines first, with options to purchase later. The economic realities herein also indicate that the substance of the parties' transactions were leases with options to purchase. The monthly rentals of $ 12,000 for the CMI spreader and $ 13,500 for *296 the CMI paver did not exceed the manufacturer's monthly fair rental value guidelines of $ 18,216 for the spreader and $ 17,684 for the paver. The rental rates were also within the normal range of five to 10 percent of purchase price per month that the Puffer Company used for other paving equipment it rented. The Puffer Company's rental rates for this equipment and for similar heavy equipment were the same with or without an option to purchase, and the Puffer Company considered the rates it charged petitioner to be the fair rental rates for such equipment. On this record, the Court concludes that those were the fair rental rates for the CMI paver and spreader. Even after the total rentals were applied to the purchase prices of the machines, petitioner later paid the substantial amounts of $ 129,595 for the spreader and $ 122,840 for the paver to exercise the options. At the time petitioner exercised the options herein, those amounts represented the fair market value of the used machines and the prices at which the Puffer Company could have sold the machines to other customers. Nor did the parties agree that title was to pass to petitioner on payment of a specified amount of rentals. *297 Until petitioner exercised the options to purchase, it acquired no title to or equity in the CMI equipment. Although it was clear that petitioner hoped to exercise the options when it entered the agreements herein, it was not certain then that petitioner would in fact do so at the end of the rental periods. LTV Corporation v. Commissioner, 63 T.C. 39, 50-51 (1974); Lester v. Commissioner, 32 T.C. 711, 721-722 (1959); WBSR, Inc. v. Commissioner, 30 T.C. 747, 756-757 (1958), acq. 1958-2 C.B. 1. See Breece Veneer and Panel Company v. Commissioner, 232 F. 2d 319, 322-323 (7th Cir. 1956), revg. 22 T.C. 1386 (1954). Finally, the terms used by the parties themselves in their agreements and on their respective corporate books show that the transactions were exactly what they purported to be, leases with options to purchase. The lease documents provided that the Puffer Company as lessor retained title to the equipment until transferred to the lessee through sale. Those documents further provided that the lessor had the exclusive rights to give a security interest in the machines to finance *298 the equipment (which security interest would be superior to any rights of the lessee in the property) and to assign its rights under the agreements to third parties. On the other hand, petitioner's duties as enumerated in the lease documents were consistent with its status as lessee: to pay rent, to return the machines in good condition, to indemnify the lessor against all loss and damage to the machines, to protect the machines against claims, to perform repairs and pay operating expenses of the equipment, to pay taxes or charges imposed upon the equipment or on its use during the lease period, freight and transportation charges, and to furnish a bond to insure the fulfillment of the lease. Moreover, both parties initially recorded payments under the lease agreements on their respective corporate books in accounts labeled "equipment rental." When petitioner exercised the options and paid the balances due on the machines, the Puffer Company entered those balances in an account for "equipment sales." At the same time, petitioner's bookkeeper recorded those balances in a "concrete paving equipment" account, but then petitioner removed the rentals already paid from the "equipment rental" *299 account and added those amounts to the "concrete paving equipment" account as part of the purchase price of the equipment. The Puffer Company did not change its entries for the rental payments on its corporate books. See footnote 6 above. The Court is satisfied that the payments of $ 54,000 on the paver and the $ 36,000 on the spreader were rental payments at the time petitioner paid them. Based on the above considerations, we conclude that the transactions herein were in substance and in form leases with options to purchase, and not conditional sales transactions. Northwest Acceptance Corp. v. Commissioner, supra; Lockhart Leasing Co. v. Commissioner, supra; Swift Dodge v. Commissioner, supra.
Having thus determined that the transactions herein were leases with options to purchase, we must decide whether petitioner as lessee is entitled to the investment credit on the equipment herein. Section 38 allows as a credit against income tax an amount determined under sections 46 through 50. As in effect during the period *300 in question, section 46(a) provided that, in general, the credit for a taxable year was an amount equal to 10 percent of the qualified investment. Section 46(c)(1)(A) provided that a qualified investment consisted of the applicable percentage of the basis of each "new section 38 property" placed in service by the taxpayer during a taxable year. Section 48(b)(2) defined new section 38 property as section 38 property acquired after December 31, 1961, "if the original use of such property commences with the taxpayer" after that date. Section 48(d)(1), however, provided that a lessor of property ould elect with respect to any new section 38 property to treat the lessee as having acquired such property for investment credit purposes.
Here, the Puffer Company as lessor made no section 48(d) election to treat petitioner as lessee as having acquired the machines herein for purposes of claiming the investment credit. Therefore, our inquiry is whether or not petitioner can meet the "original use" test absent such an election. We think not. Section 1.48-2(b)(7), Income Tax Regs. *301 , defines the "original use" of new section 38 property as the first use to which the property is put, whether or not such use corresponds to use of such property by the taxpayer. We have recently held that in the absence of a section 48(d) election, as here, the "original use" of leased property commences with the lessor who has used the equipment in its leasing business. Kansas City Southern Railway Company v. Commissioner, 76 T.C.     (June 30, 1981); Haddock v. Commissioner, 70 T.C. 511 (1978). Those cases are dispositive of the issue herein and petitioner's attempts to distinguish those cases are without merit. Petitioner next argues that the machines were not "placed in service" for investment credit purposes until it had purchased the equipment. Relying on Revenue Rulings 79-40, 1979-1 C.B. 13, and 78-433, 1978-2 C.B. 121, petitioner reasons that until the date of purchase, the machines were not "placed in service" under section 46 since they were not tested as fit for their intended functions and since the paver was not "certified" by the *302 State of Illinois. The facts in this case do not support petitioner's arguments, and petitioner's legal conclusions based on its view of the facts are unwarranted. Section 46(c)(1)(A) and the regulations thereunder provide only that new section 38 property shall be considered "placed in service" during a particular taxable year. On the record herein, there is no question that the CMI spreader and paver were placed in service during 1975. [8]Section 46(c)(1)(A), however, specifically provides that a qualified investment consists of the "applicable percentage of the basis of each new section 38 property (as defined in section 48(b)) placed in service by the taxpayer during such taxable year * * *." (Emphasis added.) Since section 46(c)(1)(A) covers only new section 38 property "as defined in section 48(b)" and since petitioner has failed to satisfy the original use requirement in section 48(b)(2), that would appear to end the matter. Apparently, petitioner's "placed in service" argument is designed to show that there was no use of the equipment within the meaning of section 48(b)(2) *303 until after petitioner had exercised the options and purchased the equipment. The facts show otherwise. *304 Much is made of the complexity of this equipment and the so-called "certification" process of the State of Illinois. However, the record is singularly devoid of any evidence as to what actually occurred on the job sites with this equipment and what, if anything, occurred in regard to approval by the State of Illinois. The spreader had already received approval. The record shows that the spreader was delivered to a job site in Greene County, Illinois, and that there was no problem with the spreader at any time after May 16, 1975. The record also shows that the paver was delivered to the Route 29 job site north of Springfield, Illinois, and that there was no problem with the paver at any time after June 6, 1975. Both pieces of equipment were fully operational and performing at the job sites after May 16 and June 6, respectively. Officials of the State of Illinois observed the paver in operation and permitted it to be used on the Route 29 job. In fact "approval" by the State of Illinois appears to have been a very informal process, amounting to nothing more than the absence of disapproval by the State. The Court is not persuaded that any further approval or "certification" by *305 the State of Illinois was required or ever occurred. Based on the facts in this record, the equipment was "placed in service" during the leasing period, long before petitioner purchased this equipment. To reflect the foregoing, Decision will be entered for respondent. Footnotes
1. The deficiency for the taxable year ended November 30, 1972, is due solely to respondent's adjustment to an investment credit carryback from the taxable year ended November 30, 1975, whereby respondent disallowed $ 34,243.50 of petitioner's claimed investment credit for 1975 of $ 52,520.89. ↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years here involved, unless otherwise indicated.↩
3. The rental period for the paver was longer, apparently because the paver was a more complex piece of equipment and required more service calls and technical assistance than the spreader.↩
4. CMI's Rental Guideline Book stated that the spreader should be rented at all percent of the discounted purchase price of $ 165,595 per month, $ 18,216 per month compared to the $ 12,000 per month here (total three month rental = 32.4% or $ 53,818 per CMI, compared to the $ 36,000 total here). CMI's Rental Guideline Book also stated that the paver should be rented at 10 percent of the discounted purchase price of $ 176,840 per month, $ 17,684 per month compared to the $ 13,500 per month here (total four month rental = 39.4% or $ 69,674 per CMI, compared to $ 54,000 total here per Puffer). The Puffer Company's rental of the spreader at $ 12,000 per month was $ 6,216 per month lower than CMI's guideline and Puffer's rental of the paver at $ 13,500 per month was $ 4,184 per month lower than CMI's guideline. CMI's guidelines were merely recommended rental rates for use by its own employees and were not intended to serve as guidelines for rental rates of its distributors with their customers.↩
5. Petitioner's officer suggested early in his testimony that formal approval or certification of the paver occurred near the end of 1975. However, when pressed for details of this approval or so-called "certification" process, he admitted that it was nothing more than the fact that the State officials did not disapprove the paver and did not order the machine to be removed from the job site.↩
6. At the time petitioner entered these figures on its books as an expenditure for equipment, it changed the prior entries for rental payments, removing the expenditures from the rental account and showing the rental amounts as part of the purchase payments for concrete paving equipment. Thus petitioner claimed an investment credit for this equipment based on a purchase price of $ 342,435 ($ 176,840 for the paver and $ 165,595 for the spreader). The Puffer Company did not change its corporate books to recharacterize the rental payments as petitioner did.↩
7. Petitioner does not contend that the equipment herein qualifies as "used section 38 property," as defined in section 48(c)(1) and section 1.48-3, Income Tax Regs.↩
8. Section 1.46-3(d), Income Tax Regs., provides in pertinent part: (d) Placed in service. (1) For purposes of the credit allowed by section 38, property shall be considered placed in service in the earlier of the following taxable years: (i) The taxable year in which, under the taxpayer's depreciation practice, the period for depreciation with respect to such property begins; or (ii) The taxable year in which the property is placed in a condition or state of readiness and availability for a specifically assigned function, * * * in a trade or business * * *. (2) In the case of property acquired by a taxpayer for use in his trade or business * * * the following are examples of cases where property shall be considered in a condition or state of readiness and availability for a specifically assigned function: (iii) Equipment is acquired for a specifically assigned function and is operational but is undergoing testing to eliminate any defects.↩